Gifford W. Price (2647)
MACKEY PRICE LAW, a Utah Corporation
350 American Plaza II
57 West 200 South
Salt Lake City, UT 84101
Telephone: (801) 575-5000

Matthew G. Bagley (6820)
Jeffrey R. Stephens (4774)
5300 South 360 West, Suite 300
Murray, UT 84123
Telephone (801) 287-8152
Facsimile (801) 287-8396
Attorneys for Plaintiff

IN THE THIRD JUDICIAL DISTRICT COURT
IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| SECURITY NATIONAL LIFE INSURANCE COMPANY, a Utah corporation,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>INNOVATIVE INSURANCE BROKERS, INC., a New York corporation; INNOVATIVE FINANCIAL PARTNERS, LLC, a North Carolina limited liability company; JOHN SPINNER; JOSHUA TYLER BENSON; JIM BOYLES; and MATTHEW MURRAY,<br><br>　　　　　Defendants. | **THIRTY (30) DAY SUMMONS**<br><br>Civil No. 190904986<br><br>Judge Royal I. Hansen |

The State of Utah to:

JOSHUA TYLER BENSON
5117 Laurenbridge Lane
Wilmington, North Carolina 28409

     You are summoned and required to answer the attached complaint/petition. Within 30 days after service of this summons, you must file your written, signed answer with the clerk of the court at the court address of the above-named Court located at 450 South State Street, Salt Lake City, Utah 84114. A blank answer form is available on the court's website: **www.utcourts.gov/howto/answer/**.

     Within that 30 days you must also mail or deliver a copy of your answer to the party or the party's attorney, Gifford W. Price, at Mackey Price Law, 350 American Plaza II, 57 West 200 South, Salt Lake City, Utah 84101. If you fail to do so, judgment by default may be taken against you for the relief demanded in the complaint or petition.

     The court's Finding Legal Help web page (**www.utcourts.gov/howto/legalassist/**) provides information about the ways you can get legal help, including the Self-Help Center, reduced-fee attorneys, limited legal help and free legal clinics.

       **DATED** this 25th day of June, 2019.

            **MACKEY PRICE LAW, a Utah Corporation**

            /s/ Gifford W. Price
            Gifford W. Price
            Attorneys for Security National Life
              Insurance Company

Gifford W. Price (2647)
MACKEY PRICE LAW, a Utah Corporation
350 American Plaza II
57 West 200 South
Salt Lake City, UT 84101
Telephone: (801) 575-5000

Matthew G. Bagley (6820)
Jeffrey R. Stephens (4774)
5300 South 360 West, Suite 300
Murray, UT 84123
Telephone (801) 287-8152
Facsimile (801) 287-8396
Attorneys for Plaintiff

IN THE THIRD JUDICIAL DISTRICT COURT
IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| SECURITY NATIONAL LIFE INSURANCE COMPANY, a Utah corporation,<br><br>Plaintiff,<br><br>v.<br><br>INNOVATIVE INSURANCE BROKERS, INC., a New York corporation; INNOVATIVE FINANCIAL PARTNERS, LLC, a North Carolina limited liability company; JOHN SPINNER; JOSHUA TYLER BENSON; JIM BOYLES; and MATTHEW MURRAY,<br><br>Defendants. | **THIRTY (30) DAY SUMMONS**<br><br>Civil No. 190904986<br><br>Judge Royal I. Hansen |

Gifford W. Price (2647)
MACKEY PRICE LAW, a Utah Corporation
350 American Plaza II
57 West 200 South
Salt Lake City, UT 84101
Telephone: (801) 575-5000

Matthew G. Bagley (6820)
Jeffrey R. Stephens (4774)
SECURITY NATIONAL LIFE INSURANCE COMPANY
5300 South 360 West, Suite 300
Murray, UT 84123
Telephone (801) 287-8152

Attorneys for Plaintiff

---

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| SECURITY NATIONAL LIFE INSURANCE COMPANY, a Utah corporation, | **COMPLAINT** |
| Plaintiff, | Case No.  190904986 |
| v. | Judge  Royal I. Hansen |
| INNOVATIVE INSURANCE BROKERS, INC., a New York corporation; INNOVATIVE FINANCIAL PARTNERS, LLC, a North Carolina limited liability company; JOHN SPINNER; JOSHUA TYLER BENSON; JIM BOYLES; and MATTHEW MURRAY, | |
| Defendants. | |



Plaintiff Security National Life Insurance Company alleges as follows for claims for relief against Defendants Innovative Insurance Brokers, Inc., Innovative Financial Partners, LLC, John Spinner, Joshua Tyler Benson, Jim Boyles, and Matthew Murray:

## PARTIES AND JURISDICTION

1. Plaintiff Security National Life Insurance Company ("SNL") is a Utah corporation with its principal place of business in Salt Lake County, state of Utah, and is a properly licensed insurer that is authorized to do business in the state of Utah.

2. Defendant Innovative Insurance Brokers, Inc. ("Innovative Insurance") is an insurance marketing organization and a New York corporation that is registered to do business in North Carolina, is currently licensed in and by the state of Utah to produce insurance, and is an affiliate of or predecessor in interest to Defendant Innovative Financial Partners, LLC.

3. Defendant Innovative Financial Partners, LLC ("Innovative Financial") is an insurance marketing organization and North Carolina limited liability company, is currently licensed in and by the state of Utah to produce insurance, and is an affiliate of or the successor in interest to Innovative Insurance Brokers, Inc.

4. Defendant John Spinner ("Spinner") is an individual upon information and belief residing in the state of North Carolina, and is licensed in and by the state of Utah to produce insurance.

5. Defendant Joshua Tyler Benson ("Benson") is an individual residing in the state of North Carolina, and is licensed in and by the state of Utah to produce insurance.

6. Defendant Jim Boyles ("Boyles") is an individual residing in the state of Louisiana.

7. Defendant Matthew Murray ("Murray") is an individual residing in the state of South Carolina.

2

8.      This Court has personal jurisdiction over each of the Defendants:

(i)      Defendants Innovative Insurance, Innovative Financial, Boyles and Murray by contract have agreed to jurisdiction and venue in this Court;

(ii)     Defendants Spinner and Benson each personally guarantied one of the corporate Defendants' contracts referenced above, and in so doing committed to undertaking the respective corporate Defendants' obligations under the contracts, thus including consenting to jurisdiction and venue in this Court;

(iii)    Defendants took actions they knew or could have reasonably anticipated would cause injury in the state of Utah; and

(iv)     each of the Defendants has purposefully availed themselves of the privilege of conducting business in the state of Utah and of the protection of the laws of the state of Utah by being licensed by the state of Utah to produce insurance in the state of Utah or by entering into an agency or employment agreement with a Utah corporation.

9.      Venue is proper in this Court since Defendants agreed, or by guaranty agreed to litigate any disputes arising under the contracts at issue in this matter in Salt Lake County, which is also where Plaintiff SNL has it principal place of business.

10.     This case is brought under Tier 2 of the Utah R. Civ. P. 26(c)(3).

## **GENERAL ALLEGATIONS**

11.     SNL, among other things, is in the business of marketing, selling and providing life insurance and annuity products to members of the public.

3

Boyles

12.     In connection with that business, on or about August 2, 2012, Boyles was authorized to solicit applications for life insurance and annuities on SNL's behalf, among other things. (Agent & General Agent Agreement, attached hereto as Exhibit "A.")

13.     As a material condition and inducement for SNL to enter into the agency agreement with Defendant Boyles, the agreement provided among other things that Boyles would not induce or attempt to induce any agent of SNL to terminate services for SNL or to sell the policies of another life insurance company, and that such a covenant would continue for five years after the termination of Boyles' appointment. (Exhibit "A" at ¶ 40.)

14.     On or about December 16, 2013, Boyles was hired by SNL as a market sales director, and was later promoted to Regional Sales Director and executed an agreement effective in May, 2018. (Employment Agreement – Regional Director of Sales, attached hereto as Exhibit "B.")

15.     As a material condition and inducement for SNL to enter into the employment agreement with Defendant Boyles, the agreement provided among other things that Boyles would not induce or attempt to induce any agent of SNL to terminate services for SNL or to sell the policies of another life insurance company, and that such a covenant would continue for five years after the termination of Boyles' employment. (Exhibit "B" at ¶ 10.)

16.     On or about October 29, 2018, SNL terminated Defendant Boyles as both an employee and agent of SNL.  At that time, it sent him correspondence reminding him of his continuing obligations. (10/30/18 correspondence from Matthew Bagley to Jim Boyles, attached hereto as Exhibit "C.")

4

17.     Defendant Boyles subsequently began working for Defendant Innovative Insurance.

18.     In March, 2019, SNL received information that Defendant Boyles had been attempting to induce SNL's agents to leave SNL, contrary to his continuing covenant and despite being expressly reminded of that obligation at the time of his termination.   SNL directed correspondence to Boyles directing him to cease and desist from any further such activity.  (3/8/19 correspondence from Matthew Bagley to Jim Boyles, attached hereto as Exhibit "D.")

19.     In view of the circumstances, and thus upon information and/or belief, Defendant Boyles has continued or may continue in his attempt to induce SNL agents to leave SNL despite two express reminders of his continuing covenant not to do so.

Murray

20.     On or about May 11, 2017, SNL entered into an Agent & General Agent Agreement with Matthew Murray ("Murray") whereby Murray was authorized to solicit applications for life insurance and annuities on SNL's behalf, among other things.   (Agent & General Agent Agreement, attached hereto as Exhibit "E.")

21.     As a material condition and inducement for SNL to enter into the agency agreement with Defendant Murray, the agreement provided among other things that Murray would not induce or attempt to induce any agent of SNL to terminate services for SNL or to sell the policies of another life insurance company, and that such a covenant would continue for five years after the termination of Murray's appointment.  (Exhibit "E" at ¶ 40.)

22.     On or about September 17, 2018, Murray entered into an employment agreement with SNL wherein he was employed as a market sales director for SNL, and as such among other

5

things he was responsible to promote SNL's business, products and services, and to supervise and manage other SNL agents within the state of South Carolina. (Employment Agreement – Market Sales Director, attached hereto as Exhibit "F.")

23.     As a material condition and inducement for SNL to enter into the employment agreement with Defendant Murray, the agreement provided among other things that Murray would not induce or attempt to induce any agent of SNL to terminate its services for SNL or to sell the policies of another life insurance company, and that such a covenant would continue for five years after the termination of Murray's employment. (Exhibit "F" at ¶ 10.)

24.     On or about May 21, 2019, Murray terminated his employment in order to take employment as the National Sales Trainer for Innovative Financial. At that time, SNL sent Murray correspondence reminding him of his continuing obligations. (5/22/19 correspondence from Matthew Bagley to Matthew Bagley, attached hereto as Exhibit "G.")

25.     Upon information and belief, Murray was induced by either Defendant Innovative Insurance or Defendant Innovative Financial to terminate his employment with SNL in order to work and provide services for Innovative Financial.

26.     In view of the circumstances, and thus upon information and/or belief, since taking employment with Defendant Innovative Financial, Defendant Murray has attempted to induce SNL agents to leave SNL in violation of his continuing covenant to not induce or attempt to induce, and despite the express reminder from SNL not to do so.

Innovative Insurance

27.     On or about April 24, 2018, Plaintiff SNL entered into an Agency Agreement with Defendant Innovative Insurance whereby Innovative Insurance was authorized to solicit

6

applications for life insurance and annuities on SNL's behalf, among other things. (Security

National Life Insurance Company Agency Agreement, attached hereto as Exhibit "H.")

28.     A material provision of the contract with Defendant Innovative Insurance stated in

pertinent part:

> Agent further agrees to NOT induce or attempt to induce any agent or other person to terminate his/her services with the Company, or any of Company's agents to sell policies of another life insurance company . . . .

> Agent agrees that any engagement in activities described in the preceding four paragraphs will result in irreparable injury to the Company, for which there is no adequate remedy at law. Thus, Agent agrees that in the event Agent breaches any of said paragraphs, the Company may apply for and obtain immediate and continuing injunctive relief prohibiting further or continued breach of Agent's obligations, and further agrees to liquidated damages in the amount of two (2) years of annual premium for all policies which are terminated as a result of Agent's activities and in the amount of the commissions for the preceding 365 days for any agents who terminate or reduce their activity as a result of Agent's activities.

(Exhibit "H" at ¶¶ 38-39.)

29.     As part of the Agency Agreement and as a material inducement for Plaintiff SNL

to enter into the Agency Agreement, Defendant Spinner, Vice President of Defendant Innovative

Insurance, executed a document entitled "Personal Guaranties" wherein he personally guarantied

Innovative Insurance's performance of its obligations, and, as well as the amounts payable under

the Agency Agreement. (Personal Guaranties attached hereto as Exhibit "I.")

Innovative Financial

30.     Defendant Innovative Financial is a successor in interest to Defendant Innovative

Insurance.

31.     On or about May 21, 2019, Plaintiff SNL entered into an Agency Agreement with

Defendant Innovative Financial whereby Innovative Financial was authorized to solicit

7

applications for life insurance and annuities on SNL's behalf, among other things.  (Security

National Life Insurance Company Agency Agreement, attached hereto as Exhibit "J.")

32.     A material provision of the contract with Defendant Innovative Financial stated in

pertinent part:

> Agent further agrees to NOT induce or attempt to induce any agent or other person
> to terminate his/her services with the Company, or any of Company's agents to sell
> policies of another life insurance company . . . .
>
> Agent agrees that any engagement in activities described in the preceding four
> paragraphs will result in irreparable injury to the Company, for which there is no
> adequate remedy at law.  Thus, Agent agrees that in the event Agent breaches any
> of said paragraphs, the Company may apply for and obtain immediate and
> continuing injunctive relief prohibiting further or continued breach of Agent's
> obligations, and further agrees to liquidated damages in the amount of two (2) years
> of annual premium for all policies which are terminated as a result of Agent's
> activities and in the amount of the commissions for the preceding 365 days for any
> agents who terminate or reduce their activity as a result of Agent's activities.

33.     As part of the Agency Agreement and as a material inducement for Plaintiff SNL

to enter into the Agency Agreement, Defendant Benson, the CEO of Innovative Financial,

executed a document entitled "Personal Guaranties" wherein he personally guarantied Innovative

Financial's performance of obligations as well as the amounts payable under the Agency

Agreement.  (Personal Guaranties attached hereto as Exhibit "K.")

34.     Despite Defendants Innovative Insurance's and Innovative Financial's duties of

loyalty to SNMC, and agreement to not induce or attempt to induce SNL's agents to leave SNL,

in view of the circumstances, and thus upon information and/or belief, during their appointment as

agents of SNL, Innovative Insurance and/or Innovative Financial induced Murray to leave SNL

and to work for Innovative Financial.

8

## FIRST CAUSE OF ACTION
### (Breach of Contract, Violation of Restrictive Covenant – Innovative Insurance)

35.    Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

36.    The Agency Agreement between SNL and Defendant Innovative Insurance was a valid and enforceable contract supported by mutual consideration.

37.    Plaintiff SNL performed all obligations required of it under the parties' Agency Agreement.

38.    In view of the circumstances, and thus upon information and/or belief, Defendant Innovative Insurance engaged in conduct that induced Defendant Murray, an employee and agent of Plaintiff SNL, to leave the employment of SNL for Defendant Innovative Financial, a breach of its Agency Agreement with SNL.

39.    Pursuant to the parties' contractual stipulation, Plaintiff SNL has incurred liquidated damages in the amount of Defendant Murray's commissions paid by SNL for 365 days prior to his termination in a principal amount to be proved at the trial of this matter, but in no event less than $49,331.16.

40.    In addition to liquidated damages, and with respect to Defendant Innovative Insurance's breach, Plaintiff SNL asserts damages including, but not limited to, costs of recruiting, training, and integrating a replacement for Defendant Murray.

41.    Plaintiff SNL is entitled to reasonable attorney's fees, costs and expenses incurred in this matter as provided by Defendant Innovative Insurance's Agency Agreement.

## SECOND CAUSE OF ACTION
### (Intentional Interference with Economic Relations – Innovative Insurance)

42.    Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

9

43.     In view of the circumstances, and thus upon information and/or belief, the inducement of Defendant Murray by Defendant Innovative Insurance to leave Plaintiff SNL's employment to work with Defendant Innovative Financial interfered with SNL's existing and potential economic relations with both its employees and customers.

44.     In view of the circumstances, and thus upon information and/or belief, Defendant Innovative Insurance interfered with Plaintiff SNL's existing and potential economic relations by the improper means of breaching its contractual obligations owed to SNL including the covenant of non-inducement.

45.     With respect to the interference as set forth above, Plaintiff SNL asserts damages including, but not limited, to costs of recruiting, training, and integrating new employees, and potentially others, together with lost profits on operations.

46.     SNL has suffered, and may continue to suffer irreparable injury thereby justifying preliminary and permanent injunctive relief, and is entitled to reasonable attorney's fees, costs and expenses incurred in this matter as provided by Defendant Innovative Insurance's Agency Agreement.

### THIRD CAUSE OF ACTION
**(Breach of Personal Guarantee - Spinner)**

47.     Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

48.     As a material inducement for SNL to enter into the Agency Agreement between Plaintiff SNL and Defendant Innovative Insurance, Defendant Spinner executed the document entitled "Personal Guaranties" wherein he personally guarantied the performance of all of

10

Innovative Insurance's obligations to SNL as well as all amounts payable under the "Personal Guaranties" document.

49.     Defendant Spinner is liable to Plaintiff SNL for any liquidated damages due and owing under the "Personal Guaranties" document as a result of Defendant Innovative Insurance's breach of the same in a principal amount to be proved at the trial of this matter, but in no event less than $49,331.16.

50.     Plaintiff SNL is entitled to reasonable attorney's fees and costs and expenses incurred in this matter as provided by Defendant Innovative Insurance's Agency Agreement.

### FOURTH CAUSE OF ACTION
### (Breach of Contract, Violation of Restrictive Covenant – Innovative Financial)

51.     Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

52.     The Agency Agreement between SNL and Defendant Innovative Financial was a valid and enforceable contract supported by mutual consideration.

53.     Plaintiff SNL performed all obligations required of it under the parties' Agency Agreement.

54.     In view of the circumstances, and thus upon information and/or belief, Defendant Innovative Financial engaged in conduct that induced Defendant Murray, an employee and agent of Plaintiff SNL, to leave the employment of SNL for Innovative Financial, a breach of its Agency Agreement with SNL.

55.     Pursuant to the parties' contractual stipulation, Plaintiff SNL has incurred liquidated damages in the amount of Defendant Murray's commissions paid by SNL for 365 days

11

prior to his termination in a principal amount to be proved at the trial of this matter, but in no event less than $49,331.16.

56.     In addition to liquidated damages and with respect to Defendant Innovative Insurance's breach, Plaintiff SNL asserts damages including, but not limited to, costs of recruiting, training, and integrating a replacement for Defendant Murray.

57.     Plaintiff SNL is entitled to reasonable attorney's fees and costs and expenses incurred in this matter as provided by Defendant Innovative Insurance's Agency Agreement.

### FIFTH CAUSE OF ACTION
### (Intentional Interference with Economic Relations – Innovative Financial)

58.     Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

59.     In view of the circumstances, and thus upon information and/or belief, the inducement of Defendant Murray by Defendant Innovative Financial to leave Plaintiff SNL's employment to work with Innovative Financial interfered with SNL's existing and potential economic relations with both its employees and customers.

60.     In view of the circumstances, and thus upon information and/or belief, Defendant Innovative Financial interfered with Plaintiff SNL's existing and potential economic relations by the improper means of breaching its contractual obligations owed to SNL including the covenant of non-inducement.

61.     With respect to the interference as set forth above, Plaintiff SNL asserts damages, including, but not limited to, costs of recruiting, training, and integrating new employees, and potentially others, together with lost profits on operations.

12

62.     SNL has suffered and may continue to suffer irreparable injury thereby justifying preliminary and permanent injunctive relief. Plaintiff SNL is entitled to reasonable attorney's fees, and costs and expenses incurred in this matter as provided by Defendant Innovative Financial's Agency Agreement.

### SIXTH CAUSE OF ACTION
**(Breach of Personal Guarantee - Benson)**

63.     Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

64.     As a material inducement for SNL to enter into the Agency Agreement between Plaintiff SNL and Defendant Innovative Financial, Defendant Benson executed the document entitled "Personal Guaranties" wherein he personally guarantied the performance of all of Innovative Financial's obligations to SNL as well as all amounts payable under the "Personal Guaranties" document.

65.     In addition to liquidated damages, and with respect to Defendant Innovative Financial's breach, Plaintiff SNL asserts damages including, but not limited to, costs and expenses incurred in this matter as provided by Innovative Financial's Agency Agreement.

66.     Plaintiff SNL is entitled to reasonable attorney's fees and costs and expenses incurred in this matter as provided by Defendant Innovative Financial's Agency Agreement.

### SEVENTH CAUSE OF ACTION
**(Breach of Contract, Violation of Restrictive Covenant – Boyles)**

67.     Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

68.     The agency and employment agreements between SNL and Defendant Boyles were valid and enforceable contracts supported by mutual consideration.

69.     Plaintiff SNL performed all obligations required of it under the parties' agreements.

13

70.     In view of the circumstances, and thus upon information and/or belief, Defendant Boyles engaged in conduct that that was intended to induce agents of Plaintiff SNL to leave their appointment or employment with SNL in order to provide services for Defendant Innovative Insurance, a breach of his agency and employment agreements with SNL.

71.     Pursuant to the parties' agreements, SNL is entitled to appropriate injunctive relief including such pertaining to Innovative Financial, and stipulated damages in an amount to be proved at the trial of this matter.

72.     Plaintiff SNL is entitled to reasonable attorneys' fees and costs incurred in this matter as provided by the parties' agreements.

**EIGHTH CAUSE OF ACTION**
**(Intentional Interference with Economic Relations – Boyles)**

73.     Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

74.     In view of the circumstances, and thus upon information and/or belief, Boyles' attempt to induce SNL's agents to leave Plaintiff SNL's appointment to work for Defendant Innovative Insurance/Financial interferes with SNL's existing and potential economic relations.

75.     In view of the circumstances, and thus upon information and/or belief, Defendant Boyles interfered with Plaintiff SNL's existing and potential economic relations by the improper means of breaching his contractual obligations owed to SNL including the covenant of inducement and attempt to induce.

76.     With respect to the interference as set forth above, attempt to induce may continue relative to SNL employees relative to employment with Innovative Financial, together with lost profits on operations.

14

77.     SNL has suffered and may continue to suffer irreparable injury thereby justifying preliminary and permanent injunctive relief. Plaintiff SNL is entitled to reasonable attorneys' fees and costs incurred in this matter as provided by the parties' agreements.

## NINTH CAUSE OF ACTION
### (Breach of Contract, Violation of Restrictive Covenant – Murray)

78.     Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

79.     The agency and employment agreements between SNL and Defendant Murray were valid and enforceable contracts supported by mutual consideration.

80.     Plaintiff SNL performed all obligations required of it under the parties' agreements.

81.     In view of the circumstances, and thus upon information and/or belief, Defendant Murray engaged in conduct that that was intended to induce agents of Plaintiff SNL to leave their appointment or employment with SNL in order to provide services for Defendant Innovative Financial, a breach of his agency and employment agreements with SNL.

82.     Pursuant to the parties' agreements, SNL is entitled to appropriate injunctive relief and stipulated damages in an amount to be proved at the trial of this matter.

83.     Plaintiff SNL is entitled to reasonable attorneys' fees and costs incurred in this matter as provided by the parties' agreements.

## TENTH CAUSE OF ACTION
### (Intentional Interference with Economic Relations – Murray)

84.     Plaintiff SNL incorporates the allegations of the prior paragraphs as if set forth herein.

85.     In view of the circumstances, and thus upon information and/or belief, Murray's attempt to induce of SNL's agents to leave Plaintiff SNL's appointment or employment to work

15

for Defendant Innovative Financial interferes with SNL's existing and potential economic relations with both its employees and customers.

86.     In view of the circumstances, and thus upon information and/or belief, Defendant Murray interfered with Plaintiff SNL's existing and potential economic relations by the improper means of breaching his contractual obligations owed to SNL including the covenant relative to inducement and attempt to induce.

87.     With respect to the interference as set forth above, attempt to induce may continue damaging SNL including, but not limited to costs of recruiting, training, and integrating new agents or employees, and potentially others, together with lost profits on operations.

88.     SNL has suffered and may continue to suffer irreparable injury thereby justifying preliminary and permanent injunctive relief. Plaintiff SNL is entitled to reasonable attorneys' fees and costs incurred in the matter as provided by the parties' agreements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Security National Life Insurance Company prays for judgment as follows:

1.     Based on the First and Second Causes of Action, for a preliminary and permanent injunction restraining Defendant Innovative Insurance from inducing or attempting to induce, during the term provided in the parties' Agency Agreement, any of SNL's agents or employees to leave SNL's appointment or employment or to join Innovative Insurance or another entity, as well as SNL being entitled to any liquidated and other damages, together with reasonable attorney's fees and costs and expenses, and prejudgment interest as provided in law and/or equity;

16

2.      Based on the Third Cause of Action, for a judgment against Defendant Spinner in the amount of liquidated damages incurred due to Defendant Innovative Insurance's breach of the parties' Agency Agreement, in a principal amount to be proved at the trial of this matter, but in no event less than $49,331.16, together with Plaintiff SNL's reasonable attorney's fees and costs, and prejudgment interest as provided in law and/or equity;

3.      Based on the Fourth and Fifth Causes of Action, for a preliminary and permanent injunction restraining Defendant Innovative Financial from inducing or attempting to induce, during the term provided in the parties' Agency Agreement, any of SNL's agents or employees to leave SNL's appointment or employment or to join Innovative Financial or another entity, as well as SNL being entitled to any liquidated and other damages, together with reasonable attorney's fees and costs, and prejudgment interest as provided in law and/or equity;

4.      Based on the Sixth Cause of Action, for a judgment against Defendant Benson in the amount of liquidated damages incurred due to Defendant Innovative Financial's breach of the parties' Agency Agreement, in a principal amount to be proved at the trial of this matter, but in no event less than $49,331.16, together with Plaintiff SNL's reasonable attorney's fees, costs and expenses, and prejudgment interest as provided in law and/or equity;

5.      Based on the Seventh and Eighth Causes of Action, for a preliminary and permanent injunction restraining Defendant Jim Boyles from inducing or attempting to induce, during the term provided in the parties' agent and employment agreements, any of SNL's agents or employees to leave SNL's appointment or employment or to join Innovative Financial or another entity, as well as SNL being entitled to any liquidated and other damages, together with reasonable attorneys' fees and costs, and prejudgment interest as provided in law and/or equity;

17

6. Based on the Ninth and Tenth Causes of Action, for a preliminary and permanent injunction restraining Defendant Matthew Murray from inducing or attempting to induce, during the term provided in the parties' agent and employment agreements, any of SNL's agents or employees to leave SNL's appointment or employment or to join Innovative Financial or another entity, as well as SNL being entitled to any liquidated and other damages, together with reasonable attorneys' fees and costs, and prejudgment interest as provided in law and/or equity; and

7. For such other and further relief as may be deemed appropriate in law and/or in equity.

**DATED** this 21st day of June, 2019.

/s/ Gifford W. Price
Gifford W. Price
MACKEY PRICE LAW,
 a Utah corporation

/s/ Matthew G. Bagley
Matthew G. Bagley
Jeffrey R. Stephens
SECURITYNATIONAL MORTGAGE
 COMPANY

Plaintiff's Address:
5300 South 360 West, Suite 300
Murray, UT 84123

# EXHIBIT "A"

## SECURITY NATIONAL LIFE INSURANCE COMPANY

### AGENT & GENERAL AGENT AGREEMENT

**WITNESSETH** that, in consideration of the promises and covenants herein, the parties to this Agreement will transact business upon the following terms and conditions:

**AUTHORITY**
1. Agent is hereby authorized to solicit applications for insurance and annuities for the Company, to collect the first premium in cash, check, or other form of payment acceptable to the Company, on each policy of insurance or annuity applied for and to pay the same over to the Company without any reduction, to deliver policies of insurance and annuities as directed by the Company if the proposed insured is in good health and the first premium has been paid, and to do any act or perform any duty which is specifically authorized in writing by an officer of the Company.

**LIMITATION OF AUTHORITY**
2. Agent has no authority to alter, modify, waive, or change any of the terms, rates or conditions of the Company's policies or contracts. Likewise, Agent shall have no authority to collect or receipt for premiums or renewals other than the first premium, to endorse checks payable to the Company, or to advertise or publish any matter or thing concerning the Company or its policies, without permission of the Company, or to do or perform any act or thing other than is expressly granted herein.

**RELATIONSHIP**
3. The relationship between the Company and Agent shall be that of independent contractor and contractee, and not that of employer and employee. Agent agrees to report to all taxing authorities as a self-employed person and to pay all taxes accordingly and to hold Company harmless from liability for any non-payment thereof. Agent agrees that the state and Federal laws and regulations relating to Social Security and other income tax withholdings shall not apply to the relationship created by this Agreement. Within the territory herein designated, Agent shall be free to exercise independent judgment as to the persons from whom applications are solicited, as to the time and place of solicitation, and as to the methods by which the desired results are to be obtained. The Company may from time to time prescribe rules and regulations with respect to the conduct of the business covered hereby, not interfering with such freedom of action of Agent, which rules and regulations Agent will agree to and observe. It is agreed that if any training materials, sales aids, or similar services are furnished to Agent they are not intended to control Agent. All advertisements, lead cards, or any other sales literature must be given the Company's prior written approval prior to public dissemination, in accordance with Company's advertising policy. Agent is not a captive agent of Company and is free to represent other insurers.

**TERRITORY**
4. Agent shall have the right to represent the Company in all states in which Company and Agent are licensed to do business, subject to any territorial restrictions imposed by the Company.

## COMMISSIONS

5. Subject to the vesting provisions and other provisions of this Agreement, and in accordance with the rules and regulations of the Company now existing and as hereinafter established, the Company will pay commissions to Agent on premiums paid to the company on account of individual policies issued during the term of the Agreement upon applications procured and submitted by Agent. Such commissions shall equal the percentages of premium shown in Company's Commission Schedule for the policy years set forth in such schedule. The Commission Schedule and rates of commissions may be changed from time to time, in the Company's sole discretion. Such changes, however, shall only affect applications submitted after the effective dates of such changes.

6. Commissions will not be paid on interim term premiums, premiums waived, premiums paid by automatic premium loan, coupons, premiums paid in advance (except as they are applied toward payment of the current premiums), or premiums paid subsequent to a lapse of a policy unless the policy is reinstated solely through the instrumentality of Agent. The Company, in its sole discretion, will decide as to the payment of commissions and amounts of any commissions on premiums in substandard cases, on first year premiums for a policy applied for within ten years before or after a policy on the same insured lapses or is reduced or exchanged, on first year premiums for a new policy arising by reason of conversion or change of policy, on the first year premiums for benefits or riders added to an existing policy, and on premiums for policies not included herein or which may hereafter be issued by the Company.

7. Company may, at any time, discontinue, withdraw, change, and/or modify any policy or rate, including interest factors, mortality charges, expense factors, or other items on any policy, and Company may, at any time, upon prior written notice to Agent, discontinue, withdraw, change, add, or modify compensation on any policy. Any such modification to compensation shall apply only to policies issued by Company pursuant to applications dated on or after the effective date of such notice, provided, however, such limitations shall not apply to any action taken by Company in conjunction with Company's disposition of in force policies constituting a block of business.

8. The amount, if any, and time of payment of commissions earned on interim term premiums, temporary extra premiums, replacement, changes, conversions, exchanges, term renewal premiums paid in advance, the portion of any insurance applied for which is reinsured by Company, other extra premiums, and other special cases shall be governed by Company rules and regulations in effect at the date of issue of the policy.

9. Agent further agrees that Company may withhold and maintain a reserve amount based on a percentage of Agent's commissions. Retention percentages shall be established and changed by Company in its sole discretion. Such reserved amounts shall be available at all times to Company to pay any indebtedness owed to Company. Agent also agrees that Company may increase the retention percentages to such amounts deemed appropriate by Company, in its sole discretion, in the event that Company, in its sole discretion, deems the reserve account balance to be inadequate under the circumstances.

10. A statement of Agent's indebtedness, earnings, commissions, advances, loans, reserves, charges, reductions, and repayments (hereinafter "Statement") is available to Agent on the Company's website. It is Agent's duty to be knowledgeable and advised as to the status of Agent's Statement. Agent stipulates and agrees that 30 days from the date the Company posts any item to Agent's Statement, that item shall be deemed accurate, correct, and binding upon Agent, unless Agent questions in writing with specificity (including the reasons on an item by item basis) the accuracy of any such item.

## OVERRIDE COMMISSIONS

11. In consideration of the anticipated payment of override commissions to General Agent to be generated by the sales of Sub-Agents, General Agent is liable to the Company for the repayment of any and all indebtedness of his/her Sub-Agents, including but not limited to advances, commission overpayments, charge-backs, commission reversals, and loans.

## DUTIES OF AGENT AND GENERAL AGENT

12. Agent shall safeguard, protect, secure, and hold all Company materials of any type or form, including but not limited to policyholder files, cards, advertising material, promotional material, leaflets, booklets, and any and all other materials furnished by Company, in trust as property of the Company which is provided only for Agent's use during the term of Agent's authority.  Agent shall immediately return such materials to Company upon termination of Agent's authority or upon request by Company. Agent further agrees to preserve the privacy and confidentiality of any and all policyholder files and information, in accordance with any and all applicable state or Federal law.

13. Agent shall fully and truthfully disclose all facts which might be material to Company's underwriting of applications solicited by or through Agent.

14. Agent shall indemnify and hold Company harmless from any liabilities, losses, claims, damages, costs, and expenses, including reasonable attorney fees, arising as a result of any breach of this Agreement or any unauthorized act by Agent or by any of his/her Sub-Agents.  Agent expressly authorizes Company to charge and set off against all compensation due or to become due to Agent, all losses, liabilities, costs, claims, expenses, or damages incurred by Company, including reasonable attorney fees, by reason of such unauthorized act or any breach of this Agreement by Agent or by any of his/her Sub-Agents.

15. Sub-Agent shall continue to be independently liable to the Company for any and all amounts owed to Company, including but not limited to unremitted premiums, commission reversals, overpayments of commissions, charge-backs, negative reserve balances, or other indebtedness owed to the Company, despite the fact that Sub-Agent might also be liable to his/her General Agent for such indebtedness.

16. Agent shall deliver or cause policies to be delivered in a timely fashion, and shall deliver or permit delivery of a policy only when to the best of Agent's knowledge and belief, the health and insurable condition of the insured have not materially changed from that represented in the application. Policies not so delivered shall not be commissionable.

17. Agent shall deliver or permit policies to be delivered only if the initial premium has been paid in full.

18. Agent shall provide prompt service to policyholders and aid in the care and conservation of Company's insurance business.

19. Agent shall immediately upon request of Company, provide a written detailed statement relating to the conduct of Agent's business or the business of any of his/her Sub-Agents.

## ADVANCES ON COMMISSIONS AND INDEBTEDNESS TO COMPANY

20. The Company, in its sole discretion, may, from time to time, make loans in the form of cash advances to Agent against commissions to be earned by Agent.  <u>Whenever the term "advance" is used, it shall nevertheless be construed to mean a loan.</u>  The amount of such advance and any adjustment thereto is in the Company's sole discretion.  At the time any such advance is made, Agent may be required to execute and deliver a Promissory Note to the Company for the amount of each such cash advancement.  In the event Agent is not required to deliver a Promissory Note to the Company for such loan, Agent's receipt and acceptance of any monetary payment representing an advance from the Company shall be deemed to be Agent's agreement to the terms herein. Agent's indebtedness for any and all such loans shall be reflected on his/her account with the Company. Where no Promissory Note is executed, said indebtedness may bear interest at a rate to be determined by the Company in the Company's sole discretion, but not greater than 18% per annum, and all sums shall be due and payable upon demand by Company. The Company may demand repayment at any time in its sole discretion.  No provision herein is intended to require the payment of interest in excess of the maximum permitted by law.  If it is determined that interest in excess of the maximum permitted by law is provided for herein, Agent will not be obligated to pay the amount of such interest to the extent that it is in excess of the maximum interest rate provided by law, and any excess interest collected will be applied to reduction of the principal sum.

21. <u>Agent shall be obligated to repay the Company for all indebtedness, including but not limited to advances, commission reversals, negative reserve balances, charge-backs, and other loans made, whether or not evidenced by a Promissory Note, and all such indebtedness shall be paid upon demand of the Company, which demand may be made by Company at any time and in its sole discretion.</u>  In the event Agent associates with an insurance agency or other General Agent, Agent shall remain personally liable to Company for all indebtedness which arises from, relates to, or is incurred in connection with any insurance or annuity applications submitted by or through Agent.  In addition, in the event Agent associates with an insurance agency, all payments made by Company to the agency which relate to applications submitted by or through Agent shall satisfy Company's obligations to Agent.

22. <u>In addition to the right of the Company to demand repayment of indebtedness at any time, all indebtedness of the Agent to the Company shall automatically become due and payable upon termination of Agent's authority with the Company.  It is expressly understood and agreed that the termination of the Agent's authority shall not relieve Agent of any of his/her obligations to pay the Company for all indebtedness.</u>

23. Agent hereby agrees to pay for all costs, expenses, and reasonable attorney's fees incurred by Company in

the interpretation or enforcement of any term of this Agreement, or in any collection of any indebtedness of Agent or any of his/her Sub-Agents.

24. Company may set-off any indebtedness of Agent, including any indebtedness of any of his/her Sub-Agents, against any amounts in Agent's reserve account, Agent's commissions, or any other compensation payable to Agent under this Agreement or under any other agreement between Agent and Company. Company's right of set-off constitutes a first priority lien on all compensation and other amounts payable, and shall secure payment and performance of all Agent's indebtedness and other obligations. Company may, at any time and without notice, apply such compensation and other amounts payable to any indebtedness. Failure of Company to exercise such right to set-off against Agent's indebtedness in any instance shall not be deemed a waiver of any of Company's rights under this Agreement. Agent hereby grants to Company a security interest in all commissions, compensation, and all other amounts payable to Agent, both now existing and hereinafter arising.

25. Company shall have no obligation to pay any commissions, compensation, or other sums payable under this Agreement, or under any other agreement between Agent and the Company, so long as Agent is indebted to the Company.

26. Company may assess Agent fees for policies not taken, shortages of premiums on policies, interest, fees, and other costs of collection, and any other charges specified in Company's rules and regulations.

## REFUNDS

27. Should the Company for any reason refund any premium on any policy subject to this Agreement, Agent shall repay, on demand by the Company, any commission received or credited on that premium. If the Company's refund of premium is the result of any unauthorized act, misrepresentation, or fraudulent conduct of Agent or any of his/her Sub-Agents, Agent shall also repay to Company the full amount of the refunded premiums, upon demand by the Company.

## ASSIGNMENT

28. No assignment of any commission or any other amounts, or any portion thereof, due or to become due to Agent hereunder shall be valid unless authorized in advance in writing by the Company, and any assignment so authorized shall be subject to any and all indebtedness of Agent to the Company then or hereafter existing.

## VESTING

29. Subject to the requirement that the overall business submitted by Agent must maintain a persistency level of no less than 65%, all insurance renewal and annuity service commissions are fully vested.

30. omitted.

31. omitted.

## DISABILITY

32. Should it be necessary, in the sole discretion of the company, to terminate Agent's authority for the reason of physical or mental disability of the Agent, commissions pursuant to this Agreement shall continue to be paid during the period of such disability.

## DEATH

33. If Agent's authority is terminated by reason of death, the Company shall pay Agent's net commissions provided for in this Agreement, as directed by Agent pursuant to a written, signed document that is acceptable to Company in its sole and absolute discretion. In the absence of such a written directive, Agent's net commissions shall be paid to Agent's surviving spouse. If there exists no surviving spouse or approved written directive, any remaining net commissions shall be paid to Agent's estate.

## TERMINATION

34. Agent's authority will terminate upon the death or disability of Agent or upon notice of termination in writing from the Company, which may be delivered personally or mailed to Agent's last known address at least fifteen (15) days before the effective date of such termination. All liabilities, duties, and obligations of Agent shall survive the termination of Agent's authority.

35. Agent may voluntarily resign his authority at any time by giving written notice to Company of said resignation. This Agreement may not be terminated by Agent.

## AMENDMENT

36. This Agreement cannot be changed by any oral promise or statement by whomsoever made, and no written modification or change to this Agreement will bind the Company unless it is signed by the president, a vice president, or other authorized officer of the Company.

37. The failure of Company to enforce any provision of this Agreement shall not constitute a waiver of Company to enforce such provision in the future.

## NON-SOLICITATION

38. Agent specifically agrees that all policyholder lists, applications for insurance, policyholder information, and all other business records, memoranda, and other Company materials, are the property of the Company only and are confidential, and that they and the information contained therein shall not be used or disclosed by Agent without the specific written authorization of the Company.

39. Agent hereby agrees to NOT induce or attempt to induce, or cause or aid in any manner whatsoever any other

agent or other person to induce or attempt to induce, any policyholder to terminate any policy issued by the Company. Agent further agrees to NOT attempt to solicit, or cause or aid any other person to solicit, any policyholders of the Company to purchase policies of another life insurance company. These restrictions shall continue for a period of ten (10) years after the termination of Agent's authority.

40. Agent further agrees to NOT induce or attempt to induce any agent or other person to terminate his/her services with the Company, or any of Company's agents to sell policies of another life insurance company. These restrictions shall continue for a period of five (5) years after the termination of Agent's authority

41. Agent agrees that any engagement in activities described in the preceding three paragraphs will result in irreparable injury to the Company, for which there is no adequate remedy at law. Thus, Agent agrees that in the event Agent breaches any of said paragraphs, the Company may apply for and obtain immediate and continuing injunctive relief prohibiting further or continued breach of Agent's obligations.  Agent further agrees to liquidated damages in the amount of two (2) years of annual premium for all policies which are terminated as a result of Agent's activities, and in the amount of the commissions for the preceding 365 days for any agents who terminate or reduce their activity as a result of Agent's activities.

**SOLE AGREEMENT**

**42.** This Agreement supersedes any and all previous agreements between the parties hereto. Any previous indebtedness or obligations of Agent to Company are subject to the terms of this Agreement.

**GOVERNING LAW; JURISDICTION; ATTORNEY FEES** .

**43.** This Agreement is entered into in the State of Utah and shall be construed and governed in accordance with the laws of the State of Utah. All legal actions between or among the parties regarding this Agreement, including, without limitation, legal actions to enforce this Agreement or because of a dispute, breach, or default of this Agreement, shall be brought in the federal or state courts located in Salt Lake County, Utah, which courts shall have sole and exclusive in personam, subject matter, and other jurisdiction in connection with such legal actions and the parties acknowledge and agree that venue in such courts shall be convenient and appropriate for all purposes. Agent shall be responsible to pay for all of Company's costs and expenses, including reasonable attorney's fees, incurred in any act, action, or proceeding to interpret or enforce this Agreement.

I, **JIMMY WOODARD BOYLES,** acknowledge that I have read and understand all of the terms and conditions of this Agent & General Agent Agreement and agree to the same.

I, **Tommy Robert Overton Jr,** approve this Agent & General Agent Agreement on behalf of Security National Life Insurance Company ("SNLIC") and represent that I am duly authorized to do so.

Agent Contract SNLIC 2001-12-29 - For Guys Preneed People ONLY-clean

# EXHIBIT "B"



## Employment Agreement – Regional Director of Sales

This agreement (hereinafter "Agreement") is made by and between Security National Life Insurance Company, a Utah domiciled insurance company, (hereinafter "Employer") Jim Boyles (hereinafter "Employee").

For and in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

### 1.   EMPLOYMENT.

Employer hereby appoints Employee as a Regional Director of Sales, at the rate of compensation and subject to the terms and conditions hereinafter set forth.  Employee hereby accepts such appointment, together with all duties and responsibilities that inure to such position.  Employee shall be assigned to a specified territory, as determined by Employer.

### 2.   EXCLUSIVE EMPLOYMENT/BENEFITS.

Employee shall be an employee of Employer only.  Employer shall provide to Employee such health insurance, life insurance and other benefits, if any, that it may provide to other similarly situated employees.

### 3.   TERM.

The effective date of this Agreement shall be May 21, 2018.  Employee shall be an "at-will" employee and Employee's term of employment shall be indefinite.  This Agreement and its terms are subject to review by Employer in its sole and absolute discretion.  Employment may be terminated by Employer at any time in Employer's sole and absolute discretion, with or without cause.

### 4.   DUTIES.

Employee shall aggressively promote the business, products and services of Employer and perform such other duties as directed by Employer.  Without limiting the generality of the foregoing, other duties and responsibilities of Employee shall include those set out on the attached Exhibit "A", which is incorporated herein.

### 5.   FULL TIME EMPLOYMENT.

Employment shall be on a "full time" basis.  Employee shall work such hours, including hours in excess of forty (40) hours per week, as shall be deemed necessary by Employer for Employee to satisfactorily perform Employee's duties in a proper and time



manner. Employee recognizes that, from time to time, the business of Employer will require that the Employee devote time in excess of forty (40) hours per week. Employee shall devote Employee's entire productive time, attention, knowledge and skills solely to the business and interests of Employer, and Employer shall be entitled to all of the benefits and profits arising from the work, services and advice of Employee. Employee shall not, during the term of this Agreement, directly or indirectly render any services of a business, commercial or professional nature to any other person, entity, or organization, whether for compensation or otherwise, and whether or not such other person or organization competes with the business of Employer, without the prior written consent of Employer. Whenever requested by Employer or required by the nature of Employee's work, Employee shall work as many hours in a given work day, in addition to the regular eight (8) hours, as is reasonably necessary to complete the work assigned by Employer.

### 6.   EMPLOYEE STANDARDS.

Employee at all times during the performance of this Agreement shall strictly adhere to and obey all laws and regulations including, without limitation, those of the state(s) of Louisiana, Mississippi, Texas and Florida. Employee agrees to follow, obey and observe all of the rules, regulations, policies, procedures and systems of Employer, to observe the workdays and hours as specified by Employer, to work for the best interests of Employer, and to strive to further the goodwill and professional standing of Employer with its clients, customers and the public generally, to attend to the duties of employment hereunder regularly and to not be absent therefrom except on account of illness or other conditions beyond the control of Employee.

### 7.   COMPENSATION.

For all services rendered by Employee under this Agreement, Employee shall receive compensation from Employer as set forth in the Compensation Addendum attached hereto as Exhibit "B" and made a part hereof for all purposes. The performance of Employee shall be reviewed periodically in accordance with both objective and subjective standards including, without limitation, attitude, professional conduct, work habits, and results. Employee understands that as a Regional Sales Director, Employee will not be entitled to any overtime pay. Employee acknowledges and affirms that the salary set forth in the Compensation Addendum constitute a fair and reasonable compensation for all hours



services to be rendered under this Agreement. Employer shall have the right to set off any amounts owed by Employee to Employer pursuant to the Employer's policies that Employer may establish and modify from time to time in its sole and absolute discretion, this Agreement, the Agent Agreement, or any other agreements between the parties, against any override commission and bonus payable to Employee under this Agreement.

### 8.   EMPLOYEE EXPENSES.

Employee may be required to incur business expenses including, without limitation, expenses associated with professional and trade organizations (dues, registration fees, trips, subscriptions, etc.) and expenses associated with the use of an automobile. Employee shall not incur or pay any costs or expenses related to the discharge of his/her duties ("Employee Expenses") without the express, written preapproval of Employer. In any event, whether authorized or not, Employee shall immediately report to Employer any and all Employee Expenses. Employer will reimburse all pre-approved Employee Expenses and will reimburse unauthorized Employee Expenses as required by applicable law. Employee is authorized to incur and pay automobile expenses, without additional approval from Employer, not to exceed the amounts of the automobile allowance (the "Auto Allowance") set forth in the attached Exhibit "C", which is incorporated herein. The amount of the Auto Allowance shall be paid to Employee each month. Employee agrees and hereby certifies that he/she shall track all Employee Expenses and shall immediately notify Employer if the Auto Allowance is less than (i) Employee's actual automobile expenses necessarily incurred in the discharge of Employee's duties or (ii) Employee's automobile expenses as determined on a per mile basis utilizing the standard mileage rate promulgated by the Internal Revenue Service then in effect for all miles driven that were necessarily incurred in the discharge of Employee's duties. If Employer determines that the Auto Allowance is insufficient to reimburse Employee's automobile expenses as required by law, Employer will make additional payment to Employee.

Falsification of the actual amounts of Employee's Employee Expenses, and/or failure to notify Employer as required herein are grounds for the termination of employment. Employee shall provide to Employer appropriate documentation and receipts for his/her Employee Expenses. Any expense reimbursements for Employee Expenses, other than the Auto Allowance, shall be paid on the last day of each week.

Security National Life Insurance Company
5300 SOUTH 360 WEST, SUITE 250 | SALT LAKE CITY, UT 84123 | P.O. BOX 57220 | SALT LAKE CITY, UT 84157-0250
MAIN 801.264.1060 | FAX 866.397.9668 | TOLL FREE 800.574.7117 | WWW.SECURITYNATIONALLIFE.COM



9.     **TERMINATION.**

Employment may be terminated by either of the parties at any time. Such termination by Employer will be without notice if termination is for good cause. For purposes of this Agreement, good cause shall mean that Employee failed to perform those duties in the scope of his employment as a person of ordinary prudence in the industry would have done under the same or similar circumstances, or that he has committed acts during the course of his employment which a person of ordinary prudence would not have done under the same or similar circumstances, including, but not limited to the following:

      (a)    Employee's negligence or incompetence in performing the work;

      (b)    Employee's disobedience or insubordination;

      (c)    Employee's disloyalty to Employer;

      (d)    Employee's dishonesty, including any dishonesty outside of the scope of employment;

      (e)    Employee's immoral or indecent behavior; or

      (f)    Employee's failure to follow prescribed rules, regulations and policies of Employer.

In the event of termination without cause, fourteen (14) days written notice of termination shall be given. In the event employment is terminated, Employer shall pay Employee the compensation and expenses accrued to him through the termination date; provided, however, that in the event Employee has any outstanding amounts owed to Employer, Employee shall repay the amounts outstanding and shall allow them to be withheld from any override commission and bonus due to him/her, authorization for which is hereby expressly given.

10.     **TRADE SECRETS AND NON-SOLICITATION.**

During the term of this Agreement, Employee will have access to customer lists and compilations of information and records specific to and regularly used in the operation of the business of Employer and its affiliates. All policyholder lists, applications for insurance, policyholder information, and all other business records, memoranda, and other Employer materials, are the property of the Employer only and are confidential. Employee acknowledges that such information constitutes valuable and confidential information of Employer. Employee shall not disclose any of the aforesaid private Employer trade secrets



directly or indirectly, nor use them in any unauthorized way, either during the term of this Agreement or after termination of employment. All files, records, electronic and magnetic files, documents, specifications, equipment, order forms, service contracts, literature, manuals, catalogs, lists of customers, price lists and similar information relating to the business of Employer, whether prepared by Employer or otherwise, coming into Employee's possession shall remain the exclusive confidential property of Employer and shall not be removed from the premises of Employer except as shall be necessary for Employee to perform Employee's duties under this Agreement. Upon termination of employment for any reason, Employee will deliver all such materials in his possession and all copies thereof to Employer and will not thereafter disclose, use for his own benefit or the benefit of others, or otherwise appropriate any such information. Employee agrees that disclosure, use or appropriation of the information set forth in this paragraph will result in irreparable injury to the Employer, for which there is no adequate remedy at law. Thus, Employee agrees that in the event Employee breaches this paragraph, the Employer may apply for and obtain an injunction prohibiting further or continued breach of Employee's obligations hereunder. Employee further agrees to pay liquidated damages in an amount equal to the total compensation earned by Employee under this Agreement during the 365-day period immediately preceding the occurrence of Employee's breach.

All information stored or entered upon Employer-issued electronic devices prior to and during the time of Employee's employment, whether entered or stored by Employee, the Employer or any other authorized third party, is the exclusive, confidential and proprietary property of Employer. Employee has no expectation of privacy or ownership for any information or data Employee enters into Employer-issued devices during the course of Employee's employment. Upon termination, Employee will immediately turn over to Employer all company-issued devices. Employee shall not access any Employer-issued devices or any information contained thereon subsequent to termination. Any post-termination unauthorized manipulation or destruction by Employee of data on Employer-issued devices will subject Employee to liability under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, together with any other applicable statutory or common law remedies. Employee agrees that in the event Employee breaches this paragraph, the Employer may apply for and obtain an injunction prohibiting further or continued breach of Employ



obligations hereunder.  Employee further agrees to pay liquidated damages in an amount equal to the total compensation earned by Employee under this Agreement during the 365-day period immediately preceding the occurrence of Employee's breach.

Employee hereby agrees to NOT induce or attempt to induce, or cause or aid in any manner whatsoever any agent or other person to induce or attempt to induce, any policyholder to terminate any policy issued by the Employer.  Employee further agrees to NOT attempt to solicit, or cause or aid any other person to solicit, any policyholders of the Employer to purchase policies of another life insurance company.  These restrictions shall continue for a period of ten (10) years after the termination of employment.

Employee further agrees to NOT induce or attempt to induce any agent or other person, including but not limited to insurance marketing organizations, field marketing organizations, national marketing organizations, brokerage general agents, managing general agents, master general agents, general agents or street level agents, to terminate its, his or her services with the Employer, or any of Employer's agents to sell policies of another life insurance company. Employee also agrees to NOT induce or attempt to induce any past, present or prospective client, including but not limited to funeral homes or mortuaries marketing, utilizing or servicing SNLIC policies and products, to market, utilize or service policies or products of another provider.  These restrictions shall continue for a period of five (5) years after the termination of employment.

Employee agrees that any engagement in activities described in the preceding two paragraphs will result in irreparable injury to the Employer, for which there is no adequate remedy at law.  Thus, Employee agrees that in the event Employee breaches any of said paragraphs, the Employer may apply for and obtain immediate and continuing injunctive relief prohibiting further or continued breach of Employee's obligations.  Employee further agrees to liquidated damages in the amount of two (2) years of annual premium for all policies which are terminated as a result of Employee's activities, and in the amount of the commissions earned, during the 365-day period immediately preceding the occurrence of Employee's breach, by any agents who terminate or reduce their activity as a result of Employee's activities.



Security National Life Insurance Company
5300 SOUTH 360 WEST, SUITE 250 | SALT LAKE CITY, UT 84123 | P.O. BOX 57220 | SALT LAKE CITY, UT 84157-0250
MAIN 801.264.1060 | FAX 866.397.9668 | TOLL FREE 800.574.7117 | WWW.SECURITYNATIONALLIFE.COM



### 11.   GOVERNING LAW.

This Agreement is governed by the laws of, and is performable in, the State of Utah. Venue of any action hereunder shall be in Salt Lake County, Utah. Should it become necessary or advisable to enforce any part of this Agreement, then the party prevailing in any such action shall be entitled to an award of reasonable attorneys' fees and costs incurred in the enforcement of this Agreement or any part thereof.

### 12.   BINDING EFFECT.

This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors, receivers, trustees, and assigns. This Agreement shall not be assigned by Employee without the express prior written consent to such assignment being given in writing by Employer. This Agreement may be freely assigned by Employer to such successors and assigns, as it may deem appropriate.

### 13.   NOTICES.

Any notices which must be given hereunder are deemed to have been given when they are either delivered in person, or by United States mail or other courier service, postage prepaid. Notice to Employee shall be sufficient if sent to Employee's address set forth herein, or to such other address designated by him in writing. Notices sent by U.S. mail are deemed to have been received when they are deposited with the United States Postal Service plus five (5) days, week-ends and holidays inclusive. Notices to Employer must be delivered to the Vice President of Sales for the Final Expense division.

-This space intentionally left blank-



Security National Life Insurance Company
5300 SOUTH 360 WEST, SUITE 250 | SALT LAKE CITY, UT 84123 | P.O. BOX 57220 | SALT LAKE CITY, UT 84157-0250
MAIN 801.264.1060 | FAX 866.397.9668 | TOLL FREE 800.574.7117 | WWW.SECURITYNATIONALLIFE.COM



14.    **ENTIRE AGREEMENT.**

This Agreement, the attached Exhibits, and the Agent Agreement constitute the entire Agreement entered into by the parties and all other verbal and/or written agreements are null and void. This Agreement may not be altered, changed or amended, except in a writing signed by qualified representatives of both parties. If any provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be held invalid or unenforceable, such provisions shall be construed as closely as possible to its original intent but so as to remain enforceable or valid under law, and the remainder of the Agreement, or the application of such term or provision to persons whose circumstances are other than those to which it is held invalid or unenforceable, shall not be affected thereby.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on this _____ day of_____ , 20___.

EMPLOYEE:

_Jimmy W. Boyles_          _5/22/18_
(print name)                              (date)

Employee's mailing address:

_____

_____

_____

_____

SECURITY NATIONAL LIFE
INSURANCE COMPANY:

By_____
                                              (date)
Its_____

Security National Life Insurance Company
5300 SOUTH 360 WEST, SUITE 250 | SALT LAKE CITY, UT 84123 | P.O. BOX 57220 | SALT LAKE CITY, UT 84157-0250
MAIN 801.264.1060 | FAX 866.397.9668 | TOLL FREE 800.574.7117 | WWW.SECURITYNATIONALLIFE.COM



## EXHIBIT "A"
## DUTIES AND TASKS

In accordance with Paragraph 4 of the Employment Agreement, Employee's duties and responsibilities shall include, without limitation, the following:

A. Participate in the development and implementation of the Employer's marketing and sales plans.

B. Demonstrate improvement in production (which meets Employer's quality metrics), and a consistent increase of production throughout the duration of employment.

C. Recruit, appoint and train new quality Final Expense agents and agencies.

D. Maintain good relationships with appointed agents and agencies.

E. Complete and submit all required reports assigned by management.

F. Any other responsibilities which may arise in order to build and maintain relationships with appointed agents and agencies.

G. Have and maintain all necessary state insurance licenses.

I. Maintain production at volume goals set by management. (Minimum annual market production of $3,000,000 of annualized premium).

J. Maintain production within quality metrics set by management.

K. Minimum personal production of $2,500/month of annualized premium written on the Simple Security product.

EMPLOYEE:

_Jimmy W. Sayle_

Date: 5/22/18

SECURITY NATIONAL LIFE
INSURANCE COMPANY:

Date:



Security National Life Insurance Company
5300 SOUTH 360 WEST, SUITE 250 | SALT LAKE CITY, UT 84123 | P.O. BOX 57120 | SALT LAKE CITY, UT 84157-0250
MAIN 801.261.1060 | FAX 866.397.9668 | TOLL FREE 800.574.7117 | WWW.SECURITYNATIONALLIFE.COM



## EXHIBIT "B"
## COMPENSATION ADDENDUM

H.   Monthly Income:

Gross Base Salary = $55,000/annually

II.   Daily Override Commission:

Override commission of 5% on production where producers is under a Market Sales Director and override commission of up to 25% on production where producers are direct to Regional Sales Director. Maximum commission offer to any producer is 120%. Standard advance rate of 75% on EFT business and 0% on Direct Bill and Credit Card business. Standard charge-back policy applies to all overrides. Personally written business will be paid on a 125% commission level, standard advance and charge-back policies apply.

III.   Annual Production Increase Bonus:

Annual bonus based upon the increase, within Employee's territory, in activated business during the current calendar year over the immediately preceding calendar year. Subject to Employee meeting the minimum threshold set forth below, Employee shall receive 0.1% of such annual increase.

a)   Bonus to be paid out upon completion of the Employee's second full calendar year;

b)   All production results must meet the volume goal set by management;

c)   The production from the Employee's territory must meet the minimum quality metrics set by management; and

d)   Employee must have a positive advance balance on December 31st of the current year.

Employer's reserve and chargeback policies (as established and modified by Employer from time to time in its sole and absolute discretion) shall apply to all commissions.

EMPLOYEE:                                   SECURITY NATIONAL LIFE
                                            INSURANCE COMPANY:

_____                   _____

Date: __5/22/18__                           Date:_____



## EXHIBIT "C" EXPENSE REIMBURSEMENT

Employee expense reimbursements pursuant to paragraph 8 of this Agreement are limited to the following:

Actual allowable expenses, up to an annual maximum of $3,000 (prorated based on hire date) (the "Annual Expense Budget"); and

As a Market Sales Director, an American Express Corporate Card may be issued to you by the Employer. Employee hereby acknowledges and agrees that any such credit card shall be used for bona fide, **allowable business expenses only,** as set forth in this Agreement, and **NOT** for any personal expenses. Misuse or abuse of the credit card constitutes grounds for disciplinary action, legal action and termination, and may be a crime. Credit card use is monitored daily and reconciled by Employer.

EMPLOYEE:

Date: 5/22/18

SECURITY NATIONAL LIFE
INSURANCE COMPANY:

Date:



Security National Life Insurance Company
5300 SOUTH 360 WEST, SUITE 250 | SALT LAKE CITY, UT 84123 | P.O. BOX 57220 | SALT LAKE CITY, UT 84157-0250
MAIN 801.264.1060 | FAX 866.397.9668 | TOLL FREE 800.574.7117 | WWW.SECURITYNATIONALLIFE.COM